In re Marcie Kaye MATHEWS, Debtor.

Marcie Kaye MATHEWS, Plaintiff,

v.

HIGHER EDUCATION ASSISTANCE FOUNDATION and United Department of Education, et al., Defendants.

Marcie Kaye MATHEWS, Plaintiff,

v.

WICHITA STATE UNIVERSITY and Southern College of S.D.A., Defendants.

Bankruptcy No. 93–10541.
Adv. Nos. 93–5144, 93–5239.

United States Bankruptcy Court, D. Kansas.

April 28, 1994.

Garry L. Howard, Slape & Howard, Wichita, KS, for plaintiff/debtor.

Connie R. DeArmond, Asst. U.S. Atty., Wichita, KS, for defendant U.S. Dept. of Educ.

Nancy L. Ulrich, Asst. Atty. Gen., Topeka, KS, for defendant Wichita State University.

## MEMORANDUM OF DECISION ON DEBTOR'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

JOHN K. PEARSON, Bankruptcy Judge.

The above captioned adversary proceeding came on for trial before the Court on March 22, 1994. The plaintiff/debtor appeared by Garry L. Howard of Slape & Howard, Wichita, Kansas. Defendants, United States Department of Education and Wichita State University ("WSU") appeared by Connie DeArmond, Assistant United States Attorney and Nancy L. Ulrich, Assistant Attorney General for the State of Kansas, respectively.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

### NATURE OF CASE

In this adversary proceeding, the debtor seeks to discharge approximately $30,000 in student loan debts under 11 U.S.C. § 523(a)(8) on the grounds that repayment of the loans will constitute an undue hardship. The case presents a question of student loan discharge in the clearest possible manner: Whether a single debtor with no dependents and no mental or medical problems is entitled to discharge her student loans simply because her income is so low as to render a minimal standard of living difficult, if not impossible, if the loans are not discharged. For the reasons stated below, the Court concludes, reluctantly, that the loans are not dischargeable. Before she qualifies for the hardship discharge under 11 U.S.C. § 523(a)(8)(B) the debtor must show that not only is her current income inadequate, but that there is no future prospect of repayment.

### FACTS

As is so often the case in these kind of dischargeability actions, the essential facts are not in dispute. The debtor borrowed approximately $22,000 from the predecessor in interest to the Department of Education under federally guaranteed student loans and an additional $2,000 plus from WSU to finance her education at WSU. The debtor has stipulated that she is indebted to the Department of Education as of March 8, 1993 in the amount of $26,466.07. She has further stipulated that she is indebted to WSU in the sum of $2,825. Both loans became due less than seven years from the date of filing of her bankruptcy petition on March 9, 1993. These two adversary proceedings have been consolidated by order of the Court for trial. The parties stipulated to the admission of the exhibits attached to the pretrial order, including the debtor's response to numerous interrogatories.

The debtor is a thirty-six-year old single woman. She graduated from Enterprise, Kansas High School in 1975 and attended college at Southern College in Tennessee in approximately 1977. In the spring of 1980, for reasons not stated, she left Southern College. She began attending WSU in 1980 and was enrolled in the Fine Arts program. In 1984 she received her Bachelor of Arts in

Fine·Arts, with an emphasis in print making. She enrolled in the graduate program that fall, seeking a master of fine arts degree. She intended to pursue a career in teaching art at the college level. For reasons that are not clear to the Court, she was rejected by the head of the program at WSU and although she continued to attend class until sometime in 1987 or 1988, she never received a master's degree. Debtor worked as a secretary from March 1986 until April 1988 while attending WSU. Since leaving WSU in 1987 or 1988, the debtor has been employed for all but six or seven months at various jobs in Kansas and Alaska. None of the jobs relate to print making or her degree in art in any way. Although the debtor testified that she had attempted to find employment in the art field, she had been unsuccessful. She was, however, unable to identify specific jobs that she had applied for or for which she had been rejected.

The debtor stated that her art degree has not been of any benefit to her. The debtor's employment and salary history is set out in answer number 19 in Exhibit C and need not be set out in detail here. In the last few years the debtor has been involved in a number of social work type jobs. From February 1992 through late December 1992 or January 1993 (the debtor's responses were conflicting), the debtor was employed by the Breakthrough Club for approximately $17,-000 per year. For reasons not relevant, she was fired from that job. The debtor was unable to gain employment until July 1993 when she was offered her present job with Recovery Services, a drug and alcohol rehabilitation program in Wichita. She is currently employed at a wage of $6.44 per hour. The maximum wage in her present job is $7.00 per hour.

Although the debtor has had some physical problems and has been treated for depression for many years, she testified that none of the physical or mental problems prevented her from seeking employment. The debtor is hopeful of eventually becoming certified as rehabilitation counselor with the possibility of increases in pay.

The debtor has made only nominal payments on her student loan since leaving WSU in 1987 or 1988. The payments on the loan guaranteed by Department of Education total $298.03. The payments to WSU total $223.94.

The crux of the problem here is that the debtor's income simply does not afford her sufficient funds to maintain all but the most basic life style. The debtor's stated expenses total approximately $975, including a car payment of $230 and her current net income is approximately $873 per month. Her stated expenses do not include many of the common living necessities, such as entertainment, medical bills, car maintenance, and clothing. Indeed, it appears that since filing her bankruptcy petition the debtor has incurred additional debt to her mother and to a friend, Tanny Prilliman. The debtor has made certain minimal payments to Ms. Prilliman and her mother. The debtor has also incurred certain postpetition medical expenses, including those for her hospitalization at St. Joseph's Hospital in Wichita, Kansas.

Based on the debtor's employment history and statements at trial, the Court finds that it is unlikely that the debtor will achieve sufficient increase in income for the foreseeable future to both maintain a minimal style of living and repay even a portion of the student loan debt involved here. The Court, however, cannot rule out the possibility that the debtor will obtain employment and a salary level again to which she had the time she worked for the Breakthrough Club in Wichita.

## DISCUSSION

As stated above, this case presents, in very stark contrast, the question of whether a single debtor with no dependents and no medical or mental problems is entitled to discharge for student loans simply because her current income is so low as to make it difficult for her to maintain a minimal standard of living let alone have any prospect of repaying the student loans in the foreseeable future.[1] The case is unencumbered by much

1. While the government agencies involved suggest that a new program is available that would let the debtor repay loans over a thirty-year period, even that seems improbable at the debtor's

current income level. The debtor simply cannot maintain her minimal living expenses and repay the debt.

of the emotional baggage that accompanies many of these cases: There are no appealing dependents and the debtor does not have any insuperable mental or physical problems which render it unlikely that she will ever earn enough to repay the debt. She has not demonstrated that she cannot and will not ever earn more than her current income. The case really boils down to whether a low level of income constitutes undue hardship.[2]

In actions to determine the dischargeability of student loans, unlike most dischargeability actions, the debtor bears the burden of proving that the loans in question are dischargeable. *See, e.g., In re Foreman,* 119 B.R. 584 (Bankr.S.D.Ohio 1990). Whether the loans are dischargeable is a mixed question of fact and law. "In general a question of fact is one that can be answered with little or reference to law, and a question of law is one that can be answered with little or no reference to fact. So called 'mixed questions' lie in between. Such mixed questions arise 'when the facts are admitted or established and the law is undisputed,' and the issue is only whether the facts meet the statutory standard." *Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir.1986) (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982)).

Divining exactly what constitutes "undue hardship" is not an easy task. It is not defined in the Bankruptcy Code; there is little circuit court authority that attempts to define it; and district courts and bankruptcy courts are all over the board in their attempts to do so. However, as a starting point, by prefacing "hardship" with the modifier "undue," Congress clearly meant that ordinary "garden variety" hardship would not suffice. *See, e.g., In re Law,* 159 B.R. 287 (Bankr.D.S.D.1993); *In re Brunner,* 46 B.R. 752 (S.D.N.Y.1985). Given the absence of any plain meaning of the phrase, resort to legislative history is appropriate. Congress

clearly intended a higher standard for dischargeability in adopting 11 U.S.C. § 523(a)(8):

> [E]ducational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rel[y] for repayment solely on the debtor's future increased income resulting from the education. In this sense, the loan is viewed as a mortgage on the debtor's future.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6094.

This statement is borne out in almost all student borrowing situations. When a student borrower graduates, the accumulated student debt almost always dwarfs the student's tangible assets. By borrowing to finance the education, the student has in a sense gambled that after graduation he or she will be able to earn a wage sufficient to repay the debt. Repayment of the student debt often comprises a substantial portion of a recent graduate's income, and while repaying the loan may exact a hardship on the former student in that he or she may be required to eke out a fairly meager existence, it is not generally an "undue" hardship. As one court stated: "The government is not twisting the arms of potential students. The decision of whether or not to borrow for a college education lies with the individual.... If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow." *Matter of Roberson,* 999 F.2d 1132, 1137 (7th Cir.1993).[3]

Courts have taken apparently divergent paths when addressing the issue of what constitutes undue hardship in student loan dischargeability cases. There are basically only nominal differences in the various approaches, however. The determination is

---

**2.** Neither party has explored the possibilities or lack of them for other types of employment. Evidence of the presence or absence of other types of jobs would have been of assistance to the Court.

**3.** The federal student loan programs lend money to students regardless of their chosen field of study. It is not relevant to dischargeability for a court to determine that a student's education, which has been at least partially subsidized by student loans, is of little value to the student or is in a field where earning potential is limited and discharge loans on that basis. *See In re Brunner,* 46 B.R. 752, 755 n. 3 (S.D.N.Y.1985).

very fact specific, and tests merely provide an analytical tool for the courts to use. Many courts have not adopted a specific test but prefer to decide the issue on an ad hoc basis. *See In re Law,* 159 B.R. 287 (Bankr. D.S.D.1993) ("This court hesitates to accept any one test as the be-all-end-all method for finding 'undue hardship.' "); *In re Johnson,* 121 B.R. 91 (Bankr.N.D.Okla.1990) (" '[r]igid adherence by the court to a particular test robs the court of the discretion envisioned by Congress in drafting section 523(a)(8)(B)" quoting *Matter of Coleman,* 98 B.R. 443 (Bankr.S.D.Ind.1989)). These courts generally provide a laundry list of factors which they consider in making their ultimate determination.[4]

Most courts have opted for the test established in *In re Johnson,* 5 Bankr.Ct. Dec. (CRR) 532 (Bankr.E.D.Pa.1979). *Johnson* established a three step test for undue hardship. The first step is known as the "mechanical test." Under the mechanical test the court must decide whether the debtor's future income over the course of the loan's repayment period is sufficient to support the debtor and any dependents at a minimal standard of living and still allow for the repayment of the loan. *Id.* at 544. The second step is the "good faith test." This element requires a two part analysis. First, the court asks whether the debtor was negligent or irresponsible in attempting to minimize expenses and maximize financial resources. *Id.* If the court finds that the debtor was negligent or irresponsible, it must then consider whether the debtor's negligence would have altered the answer to the mechanical test. *Id.* The final step is known as the "policy test." Here, the court

must ask whether the circumstances indicate that the primary purpose of the bankruptcy filing was to discharge the student loan or that the debtor has derived some financial benefit from the education financed by the student loan. *Id.*

The *Johnson* test's primary competition for acceptance is from *In re Brunner,* 46 B.R. 752 (S.D.N.Y.1985), *aff'd,* 831 F.2d 395 (2d Cir.1987). *See Matter of Roberson,* 999 F.2d 1132 (7th Cir.1993); *In re Healey,* 161 B.R. 389 (E.D.Mich.1993); *In re Kearney (Kearney v. Nebraska Student Loan Program, Inc.),* 162 B.R. 335 (Bankr.D.Kan. 1993). In the Court's view, the *Brunner* test is best approach to determining whether repayment of a student loan will cause an "undue" hardship to the debtor.[5] The *Brunner* test is a three prong analysis that requires the debtor to show that (1) he or she cannot maintain a minimal standard of living for his- or herself and dependents if required to repay the loan; (2) there are additional circumstances which indicate that the debtor's current situation is likely to continue for a significant portion of the loan repayment period; and (3) the debtor has made a good faith effort to repay the loan. *In re Brunner,* 46 B.R. at 756.

The *Brunner* test should be applied in the order given above. Only if the debtor meets the first prong should court inquire into the second, and only if the debtor then meets the second should the court consider the third. The analysis under the first prong is similar to the mechanical test under *Johnson* and the factor analysis under the case by case approach. The debtor has to show under the first prong that at debtor's current income

---

4. *In re Coleman,* 98 B.R. 443 (Bankr.S.D.Ind. 1989), provides a typical list of the factors considered by the courts which use the case-by-case approach: (1) debtor's total incapacity to pay his or her debts currently and in the future is not within debtor's control; (2) whether debtor has made a good faith effort to work out a deferment or forbearance of payment; (3) whether the hardship is long term; (4) whether the debtor has made payments on the loan; (5) whether there is a permanent or long term disability on the debtor; (6) debtor's ability to find work in the area of study; (7) whether the debtor has made a good faith effort to minimize expenses and maximize income; (8) whether the dominant purpose of the bankruptcy was to discharge the

student loans; (9) the ratio of student debt to total debt. *Id.* at 448 (citations omitted).

5. As the Seventh Circuit noted in *In re Roberson,* 999 F.2d 1132 (7th Cir.1993), the *Brunner* test addresses the same elements as the *Johnson* test, except it does not venture into an analysis of the "policy" of the student loan. In *Brunner,* the court stated that the policy prong of the *Johnson* test inappropriately inquires into the value of the education financed by the student loan, thereby making the government "an insurer of educational value." *In re Brunner,* 46 B.R. 752, 755 n. 3 (S.D.N.Y.1985). The *Brunner* court found such an inquiry improper, and this Court agrees with that analysis.

levels, repayment of the student loans would cause his or her standard of living to fall below a minimal level. The court in *Brunner* recognized that recent graduates are generally "at the nadir of their earning power [and] [e]xtrapolation of their current earnings is likely to underestimate substantially their earning power over the whole term of loan repayment." *In re Brunner*, 46 B.R. at 754–55. Therefore, the second prong of the test requires that the debtor demonstrate that unique or exceptional circumstances exist, such as illness, lack of job skills, large numbers of dependents, or a combination of these. *See id.* and cases cited therein.

■ As the court stated in *In re Briscoe*, 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981), "dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Id.;* cited with approval in *Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993). The 'certainty of hopelessness' view shows how courts typically apply Congress's heightened standard for student loan discharge. The debtor must show that the combination of the low income and exceptional circumstances is so severe and oppressive that there is no way that the debtor will ever be able to repay the debt and maintain a minimal standard of living. *See In re Kearney (Kearney v. Nebraska Student Loan Program, Inc.)*, 162 B.R. 335 (Bankr.D.Kan. 1993) (debtor with recurring back problems and a minor daughter found to have no prospects for improving her financial situation); *In re Berthiaume*, 138 B.R. 516 (Bankr. W.D.Ky.1992) (debtor who was not able to secure permanent employment because she was suffering from a congenital heart defect, dyslexia, and clinical depression was entitled to hardship discharge); *Shoberg v. Minnesota Higher Education Coordinating Council*, 41 B.R. 684 (Bankr.D.Minn.1984) (debtor with child support obligation and medical condition coupled with few job skills had little prospect of full time employment at a decent wage was entitled to hardship discharge); *In re Dresser*, 33 B.R. 63 (Bankr.D.Maine 1983) (debtor who was unemployable for the foreseeable future due to post-traumatic stress disorder and depression was entitled to hardship discharge). Absent a personal disability, illness that makes working difficult or impossible, or dependents, courts generally believe debtors are armed with sufficient capabilities to earn their way out of whatever hole they dug with student debt. *See In re Woodcock*, 149 B.R. 957 (Bankr.D.Colo.1993) (healthy debtor with law and master's degrees not entitled to hardship discharge as he appeared to able to obtain and retain employment at a good rate of pay); *In re Silliman*, 144 B.R. 748 (Bankr.N.D.Ohio 1992) (even though debtor was currently unemployed and had a dependent, she was healthy and her skills and education made her an excellent prospect for full time employment); *In re Cahill*, 93 B.R. 8 (Bankr. N.D.N.Y.1988) (no certainty of hopelessness for healthy debtor with no dependents who had a steady job).

Congress adopted an even higher standard for discharge of certain loans for medical education. Most federal loan programs for medical education require that the debtor show that it would be *unconscionable* for the bankruptcy court to not discharge their medical school loans. *See* 42 U.S.C. §§ 254o(d)(3); 294f(g). Courts have rarely reached that conclusion. *See In re Dillingham*, 104 B.R. 505 (Bankr.N.D.Ga.1989) (it was not unconscionable to hold student debt in excess of $100,000 non dischargeable where neither doctor nor his dependents had any health problems and the doctor earned around $80,000 per year; *but see In re Matthews*, 150 B.R. 11 (Bankr.W.D.Pa.1992) (it would be unconscionable to hold entire amount of nearly $380,000 (including treble damages and interest) non-dischargeable even though doctor earned $85,000 per year, where doctor had attempted to substitute service in one medically underserved area for another; therefore half of the debt would be discharged); *cf. In re Malloy*, 144 B.R. 38 (Bankr.E.D.Va.1992) (it would be unconscionable not to discharge student loans of $90,-000 for a failed medical student who appeared incapable of earning more than a subsistence level of pay).

■ If the debtor satisfies the first two prongs of the test, he or she must next demonstrate that he or she has made a good faith effort to repay the loan. Here, the court generally looks to see if the debtor has

been negligent or irresponsible in conducting his or her financial affairs. "[U]ndue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Matter of Roberson*, 999 F.2d at 1136 (quoting Commission on the Bankruptcy Laws of the United States, Report, H.R. Doc. 137, 93rd Cong., 1st Sess., Pt. II, at 140 n. 16 (1973)).

■ Here, the debtor has demonstrated that her current income is inadequate to maintain even a minimal standard of living. She has not, however, demonstrated that she cannot and will not earn more income in the future. Indeed, in the past she earned considerably more. Moreover, she has not demonstrated that she has sought other jobs which might generate greater income. As one court put it, there is no 'certainty of hopelessness' which would justify the hardship discharge. Any lower standard would allow a debtor to manipulate the income level and discharge the loans simply by demonstrating a current impecuniosity.[6] The legislative history suggests a higher threshold.

The complaint is overruled.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

*JUDGMENT ON DECISION ON DEBTOR'S COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT*

The instant proceeding comes before the Court for ruling on debtor's complaints seeking to discharge student loan debts under 11 U.S.C. § 523(a)(8). The Honorable John K. Pearson, United States Bankruptcy Judge, presiding. The matter having been tried to the Court, and a decision having been rendered,

IT IS ORDERED BY THE COURT that the complaints are overruled.

---

**6.** Given the Court's conclusion, it need not consider the good faith portion of the test. It would seem improbable that the debtor's minimal payments on the large debt constitute a good faith effort.