**In re Carla Rae COATS, SS # 442–66–9408, Debtor.**

**Carla Rae COATS, Plaintiff,**

v.

**NEW JERSEY HIGHER EDUCATION ASSISTANCE AUTHORITY, Nebraska Student Loan Program, Inc., Oklahoma Regents for Higher Education, Winham Prof., Nebraska Student Loan Nationwide Credit, and, U.S. Department of Education, Defendants.**

**Bankruptcy No. 96–03785–M.**
**Adversary No. 97–0008–M.**

United States Bankruptcy Court,
N.D. Oklahoma.

Oct. 21, 1997.

Christopher Thrutchley, Tulsa, OK, for Carla Coats.

Mac D. Finlayson, Tulsa, OK, for New Jersey Higher Educ. Assistance Authority and Nebraska Student Loan.

Loretta F. Radford, Tulsa, OK, for U.S. Dept. of Educ.

Regina Switzer and Craig E. Fugleberg, Oklahoma City, OK, for Oklahoma Regents for Higher Educ.

### MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to the Complaint filed herein. Trial on the merits was held on August 25, 1997. Plaintiff Carla D. Coats ("Plaintiff" or "Coats") appeared personally and through her attorney, Christopher Thrutchley. Defendants New Jersey Higher Education Assistance Authority ("NJHEAA") and Nebraska Student Loan Program ("NSLP") appeared through their attorney, Mac D. Finlayson. Defendant Oklahoma Regents for Higher Education ("OKL") appeared through its attorney, Craig E. Fugleberg. Defendant United States of America, acting through the Department of Education ("USA") appeared through its attorney, Loretta F. Radford. At trial, the Court heard the testimony of witnesses and received documentary exhibits into evidence. In addition, the parties submitted certain facts to the Court by way of stipulation. Thereafter, post-trial briefs were submitted to the Court on September 15, 1997, and the matter was taken under advisement. The following findings of facts and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

This bankruptcy proceeding was commenced by Plaintiff's filing of a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on September 20, 1996. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b),[1] and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a), and it is a core pro-

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (West 1997).

ceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

### Dismissal of Certain Defendants

As a preliminary matter, the parties have stipulated that Defendants Winham Prof. and Nebraska Student Loan Nationwide Credit are not proper party defendants in this matter for the reason that they no longer hold an interest in the student loans at issue. On the basis of this stipulation, the Court, at the commencement of the trial, dismissed the action as it relates to these two defendants.

### Statement of Facts

*The Student Loan Debt*

This Adversary proceeding revolves around Coats' student loan liabilities, which total approximately $39,000, and which may be broken down as follows:

| Lender | Amount | Interest Rate | Monthly Pmt. |
|--------|--------|---------------|--------------|
| NSLP | $10,637.73 as of 2/1/97 | Variable | $63.69 |
| NJHEAA | $11,413.29 as of 1/23/96 | 8% | Unspecified |
| OKL | $12,814.98 as of 8/4/97 | Various [2] | Unspecified |
| USA | $4,343.15 as of 8/22/97 | 8% | Unspecified |
| TOTALS | $39,209.15 [3] | | |

All of these debts are in default; with the exception of the monthly payment to NSLP, their repayment schedules are unspecified. The debts owed to NJHEAA and OKL have been reduced to judgment. Coats made one payment of $100 on the NSLP debt; in addition, the debt owed to OKL has been reduced by approximately $1,200 since judgment on that debt was entered on March 21, 1995.

*Educational and Employment Background*

Coats began the relevant portion of her educational journey in 1986, when she began taking classes at Tulsa Junior College ("TJC") as a full-time student. At that time Plaintiff was a single parent. The student loans at issue were taken out in order for Coats to pay educational and living expenses for her and her son. Coats' education was continuous, though she attended different colleges, until 1993. She attended remedial classes from 1986 to 1987, while she also worked, but she could not make ends meet. During this time Plaintiff did not attempt to repay any of her debts. She consistently attended classes at TJC until 1993, when she sat out for one year. Lenders contacted Coats concerning loan repayments while she was attending TJC. She was eligible for and able to obtain deferments because she was still in school. Coats obtained her last student loan in 1991. Since 1991, Coats has financed her education through the use of what were described to the Court as "vocational rehabilitation" funds. Coats testified that these funds would not have to be repaid. Coats is currently 12 credit hours and one semester of student teaching short of receiving a bachelor's degree in special education, and intends to finish her education as time and finances allow.

*Current Financial Situation*

At the time of the filing of the bankruptcy petition, Plaintiff was a single parent with one child. Currently, she is married. Her husband's two children are part of their household, which has led to increased financial pressure. Coats is currently self-employed on a full-time basis as a "distributor" for a company identified to the Court as HerbalLife. HerbalLife apparently manufactures products for resale. Coats derives income from the resale of HerbalLife products as well as from the recruitment of other HerbalLife products "distributors." The operation in its present form is not profitable. Coats' husband ("Mr. Quick") is also an HerbalLife distributor. He does not have a high school diploma and is partially disabled. He

---

**2.** OKL held three notes. Two of the notes called for interest at the rate of 8% per annum; the third note bore interest at the rate of 9.13% per annum. All three notes have been reduced to a single judgment.

**3.** Since all of the Defendants have used a different date in determining the amounts due to them, the "total amount" is in reality an estimation.

therefore finds it difficult to obtain regular employment aside from his HerbalLife business.

Plaintiff's current financial situation is bleak. The parties have stipulated to Coats' current income and expenses. Coats' total monthly expenses amount to $5,516.72,[4] while her monthly income totals $4,218, including $484 per month in Social Security Payments and $291 per month in child support for her son. In the past, child support payments were irregular and contributed to her financial difficulties. Her husband earns from $300 to $700 net income per month. Assuming that Mr. Quick earns the maximum amount of $700 per month on a regular basis, Plaintiff's household incurs a monthly deficit of $598.72, and a yearly deficit of $7,184.64. Coats testified that she and her husband are not currently able to pay their obligations on a regular basis, and they often "juggle" expenses or simply do without. Coats has neither life nor health insurance; however, currently all of the children in the household have health insurance provided by former spouses.

Insufficient fund charges were incurred on Plaintiff's account during the time from May 1996 to May 1997 for ten (10) out of the thirteen (13) months. The average balance in her bank account for the time from May 1996 to May 1997 was approximately $80. Mr. Quick, on his account for the time period from June 1996 to June 1997 incurred at least one insufficient funds charge. His account showed some large deposits during this time period. However, Mr. Quick testified that his bank account deposits reflected his own income as well as other monies solely being used for business purposes not contributing to his income. The bottom line is that Plaintiff's bills do not get paid on a regular basis.

*Significant Non–economic Circumstances*

Coats has a son with special needs due to Attention Deficit Hyperactivity Disorder (hereinafter "ADHD"). Her son was failing his classes while attending Tulsa Public Schools. In 1986, in an effort to assist her son, she enrolled him at Town & Country School ("T & C"), which she believed to be better qualified to assist with his ADHD condition. Tuition at T & C was $449 per month, an amount which quickly proved to be beyond the means of Plaintiff.[5] Thereafter, Plaintiff enrolled her son in Union Public Schools, which provided an adequate education for her son. Her son was medicated with Ridalin for a period of time in order to control his ADHD. Currently, Coats has chosen to discontinue the use of Ridalin and treat his condition with HerbalLife products at an expense of $100 per month.

*Future Economic Prospects*

The HerbalLife business Coats pursues is, according to her testimony, growing slowly and steadily. She lacks 12 credits and a semester of student teaching to finish her degree in special education. However, she does not plan to finish her special education degree in the near future. She will finish her degree as finances allow. Plaintiff does not intend to use her education in the workforce, but has decided to stay home and work her HerbalLife business so that she may care for her children at home. Plaintiff was a licensed cosmetologist at one time, but this license has expired. Plaintiff currently has no other job skills. Coats testified that child care expenses would negate any benefits she might gain from working outside the home.

### Analysis

The issue in the case at hand is whether excepting Coats' student loans from discharge would impose an undue hardship on Coats and her dependents under § 523(a)(8)(B), which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \*

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made

---

**4.** The amount of expenses stipulated to by the parties was $5,666.72. However, on direct examination, Coats testified that she had inadvertently listed a $150 advertising expense twice.

**5.** T & C was scheduled as an unsecured creditor in the underlying bankruptcy case.

under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as educational benefit, scholarship or stipend, unless—

* * * *

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

§ 523(a)(8)(B).[6] This issue has been heavily litigated, and numerous "tests" have evolved as courts considered the issue of dischargeability under this section of the Bankruptcy Code. *See, e.g. In re Johnson,* 5 Bankr.C. Dec. 532 (Bankr.E.D.Pa.1979) (three part "mechanical, good faith and policy" test); *In re Bryant,* 72 B.R. 913 (Bankr.E.D.Pa.1987) (test based upon mathematical comparison of debtor's income to poverty standards); *In re Claxton,* 140 B.R. 565 (Bankr.N.D.Okla.1992) ("totality of the circumstances" approach); *In re Childs,* 89 B.R. 819 (Bankr.D.Neb.1988) ("totality of the circumstances" approach).

This Court believes that the interests of justice will be best served if a particular "test" is selected and uniformly applied in every case, for the reasons set forth by the United States Court of Appeals for the Third Circuit:

Before we address the merits of Faish's petition, we must decide which of the several "undue hardship" tests should be applied in the present matter. As one commentator has explained, "[b]ankruptcy courts use a wide variety of tests to determine whether the debtor has demonstrated undue hardship. While these tests have received varying degrees of acceptance, no particular test authoritatively guides or governs the undue hardship determination." Thad Collins, Note, *Forging a Middle Ground: Revision of Student Loan Debts in Bankruptcy as an Impetus to Amend 11 U.S.C. § 523(a)(8),* 75 Iowa L.Rev. 733, 744 (1990). Due to this lack of a "unified approach to undue hardship, litigants are in the difficult position of not

knowing which standard will govern their case. Consequently, effective presentation of evidence on undue hardship is made difficult unless the jurisdiction has definitively and unequivocally adopted one test and a consistent set of determinative factors." *Id.* at 747. It is to this task that we now turn.

*In re Faish,* 72 F.3d 298, 303 (3rd Cir.1995). Our court of appeals has not yet selected any particular test, but has left that matter to the individual bankruptcy courts. *See In re Woodcock,* 45 F.3d 363, 367 (10th Cir.1995). Accordingly, before proceeding any further, this Court will select a "test" which it intends to apply in every case until controlling authority dictates otherwise.

This Court will utilize the test for undue hardship established by the United States Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987) (hereafter *"Brunner"*). The test requires the debtor to establish the following:

(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good-faith efforts to repay the loans.

*Brunner,* 831 F.2d 395, 396 (2nd Cir.1987). The *Brunner* test has been adopted by at least three other Circuit Courts of Appeal. *See In re Roberson,* 999 F.2d 1132 (7th Cir. 1993); *In re Cheesman,* 25 F.3d 356 (6th Cir.1994); *In re Faish, supra.* Under the *Brunner* test, if a debtor fails to establish the presence of any of the three factors, the debt is non-dischargeable. *In re Faish, supra,* 72 F.3d at 305.

### Present Inability to Pay

Plaintiff's current inability to pay is established by the stipulated facts. Coats' current

**6.** The parties have stipulated that the loans at issue "first became due for repayment less than seven (7) years, exclusive of any suspensions of the repayment period, before the date of the

filing of Plaintiff's Petition herein." *Trial Stipulation,* ¶ 37. As a result, the exception to discharge provided under § 523(a)(8)(A) is not applicable here.

monthly expenses amount to $5,666.72. Her total monthly income only aggregates to $4,218. Therefore, her monthly deficit is $1,448.72, and her yearly deficit is $17,184.65. This Court finds that at this time Coats is unable to meet her expenses. It would not be possible for Plaintiff to provide a minimal standard of living for herself and her dependents if she was forced to repay her loans now. *Id.*

In their brief, Defendants argue that Coats has a present ability to pay her student loan indebtedness. Plaintiffs provide a mathematical analysis of Coats' income and expenses to demonstrate that, allegedly *based upon her sole income and expenses* (i.e. eliminating the expenses of her husband and her stepchildren), Coats has excess income of $363.78 per month. *Joint Trial Brief of Defendants* (hereafter *"Defendant's Brief"*), pp. 5–6. This argument is unpersuasive. Ms. Coats does not live alone; she is married. Her husband and her stepchildren are part of her household. Their expenses (if not their incomes) are interrelated. The test under § 523(a)(8)(B) is whether repayment of the student loans at issue would impose an undue hardship "on the debtor *and the debtor's dependents*" (emphasis added); any hardship, whether due or undue, which is felt by Ms. Coats will be felt by them as well. This Court does not believe that Congress intended that bankruptcy courts meddle in the marital affairs of debtors and require divorce as an element of "undue hardship" or artificially construe the finances of a particular debtor in such a manner as to force the debtor to choose her student loan obligations over those which he or she owes to his or her family.

Defendants also ask the Court to review the stipulated expenses to determine their reasonableness, alleging that "the Plaintiff may be living beyond her means." *Defendants' Brief* at 14. Such an inquiry is within the proper purview of the courts. *In re Sands*, 166 B.R. 299, 307 (Bankr. W.D.Mich.1994). The Court has reviewed the stipulated income and expenses of Debt-ors' household and finds them to be reasonable. The testimony was uncontradicted that the household expenses exceed their income. More often than not, one or more of the budgeted expenses is not incurred or goes unpaid, waiting for a more profitable month. None of the expenses, with the possible exception of a $725.00 per month house payment, can be deemed excessive.[7] Defendants point directly to the increase in expenses before and after Coats' marriage, and argue that expenses of $725 per month for housing, $238.77 for utilities and $450 per month for food are "generous." *Defendants' Brief* at 6, note 6. The increase is not probative of any of the issues before the Court; that the expansion of Coats' family and dependents caused a proportionate increase in expenses is to be expected.

In addition, the amount of the student loan debt is relevant to a determination of whether a debtor possesses the ability to pay the same. The "ability to pay a debt" is more than the mere ability to pay all or a portion of the interest on the debt as it becomes due. The ability to make some meaningful amortization of the debt must also be present. A court should consider the potential duration of repayment as it considers the issue of undue hardship.

> Undue hardship must be viewed from the perspective of the duration of the hardship as well as its severity during any portion of the repayment period. Even if Elebrashy [debtor therein] could squeeze enough from his living expenses for a year or two to pay something on the GSL Loan, committing him to that enterprise over the next twenty years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, his circumstances improve substantially and unforeseeably.

*In re Elebrashy*, 189 B.R. 922, 927 (Bankr. N.D.Ohio 1995). The burden of a debt which can never realistically be repaid constitutes an undue hardship. The debtor must be

---

7. No evidence was presented regarding the Tulsa housing market, for either the purchase or rental of homes. It is impossible for this Court to make a factual finding that a housing expense of $725.00 per month for two adults and three children is excessive.

able, at least over the long haul, to slay the beast, not merely keep it at bay.[8]

■ In the present case, the student loan debts at issue aggregate slightly in excess of $39,000.00. The lowest interest rate for any of the debt is eight per cent per annum. Assuming that this rate applied to the total indebtedness, interest alone, without any principal reduction, totals $3,210.00 per year, or $260 per month. Assuming for purposes of argument that Coats has $363 per month available to service her student loan debt, payment of this amount, assuming the eight per cent annual rate, would take approximately sixteen years. If the amount of the monthly payment is dropped to $300, the term of repayment expands to almost 26 years. This Court finds that Ms. Coats does not have the ability to get out from under this debt in any reasonable period of time or in any meaningful way.

**Future Ability to Pay**

■ The second prong of the *Brunner* test looks at whether "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. As described by one court, this prong of the test "imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period." *In re Roberson, supra,* 999 F.2d at 1135, *cited with approval, In re Faish, supra,* 72 F.3d at 305. In the eyes of this Court, the test requires a determination of whether the financial *status quo* of the debtor and the debtor's household is likely to continue into the foreseeable future. If so, the Court continues to the third test; if not, the debt is nondischargeable.

■ In this case, at the present time, Coats' education will not result in increased earning capacity. Whether she will ever obtain her degree, and any increase in income which would result, is speculative at best. She is two semesters (12 credit hours plus one semester of student teaching) from her

degree. Defendants argue that the possibility that Ms. Coats will finish her education and find more remunerative employment is proof that her economic condition will improve, and that her student loans should not be discharged. On the facts before it, this Court does not agree. Courts have been reluctant to base future earning capacity on an unfinished education. *See In re Reilly,* 118 B.R. 38, 41 (Bankr.D.Md.1990) ("Because she requires approximately 24 credits in order to obtain her college degree, the debtor is not in a position to advance in her employment."); *In re Elebrashy, supra,* 189 B.R. at 928 (debtor not required to attend school for additional two years to increase earning capacity).

Ms. Coats testified that at the present time, her HerbalLife business is not profitable but that it is the best economic endeavor available to her, especially in light of the monetary savings in day care costs. Her husband's earning capacity, as a result of his education and his partial disability, is unlikely to improve. In addition, the major non-economic factor facing this debtor; namely, the needs of her son as a result of ADHD, will continue into the foreseeable future. Ms. Coats testified without contradiction that her ability to work from home was and will continue to be crucial to her son's development. This Court finds that, by a preponderance of the evidence, Ms. Coats has demonstrated that her financial situation is unlikely to improve in the foreseeable future. Accordingly, the second prong of the *Brunner* test has been met.

**Good Faith**

■ The third element of the *Brunner* test requires that the debtor demonstrate that he or she has made a good faith effort to repay the student loan(s) at issue. *Brunner,* 831 F.2d at 396.

The final inquiry under *Brunner* is whether the debtor made a good faith effort to repay the loan. [citation omitted] This prong of the test reflects the fact that a student who receives government-guaran-

---

**8.** This Court is aware that at least one court has indicated its belief that the amount of the debt at issue should not be considered in determining

the debtor's ability to make payments on the loans. *In re Sands, supra,* 166 B.R. at 309, n. 19. This Court respectfully disagrees.

teed educational loans "assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income or minimize expenses." [citation omitted] This test encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his decision must result from 'factors beyond his reasonable control.'" [citation omitted]

*In re Elebrashy, supra,* 189 B.R. at 928. There is no *per se* requirement that a debtor pay a certain percentage or minimum amount of the loans at issue in order to meet the good faith requirement. If the debtor has not had the financial ability to pay the debt, he or she will not be penalized as a result. *In re Shoberg,* 41 B.R. 684 (Bankr.D.Minn. 1984).

■ In this case, Coats made one payment on her NSLP student loan debt totaling $100. In addition, for reasons not of record, the debt owed to the Oklahoma State Regents was reduced by approximately $1,275.00. Defendants argue that this is not enough and, in and of itself, demonstrates Coats' lack of good faith. *Defendant's Brief* at 15. Coats testified that the reason she offered no payments to her student loan creditors was because there were no funds available for that purpose. This Court, having had the opportunity to hear the testimony of Ms. Coats and observe her demeanor while on the stand, believes her. Her inability to repay the student loan debt is not indicative of bad faith and will not be so construed by this Court.

## Conclusion

Ms. Coats has met all three prongs of the *Brunner* test. She is entitled to the discharge of her student loan obligations.